1  Timothy J. Burke (181866)
   service@ssbla.com
2  STULL, STULL & BRODY
   10940 Wilshire Boulevard
3  Suite 2300
   Los Angeles, CA  90024
4  Tel:    (310) 209-2468
   Fax:    (310) 209-2087
5
   Howard T. Longman
6  STULL, STULL & BRODY
   6 East 45th Street
7  New York, NY 10017
   Tel:    (212) 687-7230
8  Fax:    (212) 490-2022

9  Gary S. Graifman
   KANTROWITZ, GOLDHAMER & GRAIFMAN
10 210 Summit Avenue
   Montvale, NJ  07645
11 Tel:    (201) 391-7000
   Fax:    (201) 307-1088
12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15

16 MICHAEL A. BERNSTEIN PROFIT        )    CASE NO. C06-04346 WHA
   SHARING KEOGH PLAN, on Behalf of Itself )
17 and All Others Similarly Situated,       )    **CLASS ACTION**
                                      )
18              Plaintiff,            )    **COMPLAINT FOR VIOLATION OF**
                                      )    **FEDERAL SECURITIES LAWS**
19        v.                          )
                                      )    **DEMAND FOR TRIAL BY JURY**
20 HAROLD HUGHES, DAVID MOORING,      )
   ROBERT K. EULAU, GEOFFREY TATE,    )
21 BRUCE DUNLEVIE, P. MICHAEL         )
   FARMWALD, JOHN D. DANFORTH,        )
22 MARK HOROWITZ, KEVIN KENNEDY,      )
   CHARLES GESCHKE, WILLIAM           )
23 DAVIDOW, and RAMBUS, INC.,         )
                                      )
24              Defendants.           )
   _____)
25

26

27

28

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1    Plaintiff, by its attorneys, submits this Class Action Complaint (the "Complaint") against the

2    defendants named herein.

3    **NATURE AND SUMMARY OF THE ACTION**

4    1.    This is a class action complaint brought on behalf of purchasers of the common

5    shares of Rambus, Inc. ("Rambus" or the "Company") who (the "Class") purchased such shares

6    between or December 12, 2001 and June 27, 2006, inclusive (the "Class Period") against Rambus

7    and Individual Defendants as described herein who were members of the Board of Directors of

8    Rambus (the "Board"), or were executive officers of Rambus, and signed its Form 10-Ks and/or

9    authorized issuance of its Proxy Statements.

10    2.    When stock options are awarded, the strike price of the options ordinarily is set equal

11    to the share price on the day of the award.  In this way, the executives of a company are supposed to

12    have their interests aligned with the shareholders, whose holdings are diluted each time an option is

13    exercised.

14    3.    As further alleged below, defendants improperly backdated (and/or had knowledge of

15    such backdating) stock option grants to various officers of the Company to make it appear that they

16    were made on dates when the market price of Rambus stock was lower than the market price on the

17    actual grant dates.  This improper backdating resulted in option grants with lower exercise prices

18    and thereby improperly increased the value of the options and improperly reduced the amounts the

19    recipients of these option had to pay the Company upon exercise of the options, and unfairly

20    transferred shareholder equity to defendants.  Defendants' conduct also violated the Company's

21    shareholder-approved stock option plans, the Company's corporate governance guidelines, the

22    Company's standards of business conduct and the Company's conflicts of interest policy.

23    4.    During the Class Period, defendants caused Rambus to file false and misleading

24    statements with the Securities Exchange Commission ("SEC"), including but not limited to, Proxy

25    Statements filed with the SEC, which stated "Unless otherwise indicated, options were granted at an

26    exercise price equal to the fair market value of the Company's Common Stock at the date of grant."

27    Since according to the scheme of backdating options, on the actual date that the defendants agreed

28    to grant options to the recipient the trading price of the stock was **higher** then the "fair market

2

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

value" of the stock on the date of grant, the aforementioned statement repeated in Rambus Proxy Statements issued during the Class Period, which are enumerated and described more fully below, was materially false and misleading. Furthermore, if the option grant is backdated, the options value is not "fair" from the vantage point of the Company and its shareholders.

5. Defendants' backdating of options grants also violated provisions of the Internal Revenue Code relating to deduction of option payments and thereby rendered the Company's financial statements in Form 10-K filings for the years 2002, 2003, 2004 and 2005 materially false and misleading. Rambus' Audit Committee of its Board of Directors (the "Audit Committee") continuing investigation may determine that the Company has to absorb substantial charges to correct the error which will likely wipe out a portion of past profits reported. In addition, the Company's financial statements in Form 10-K filings for the years 2002, 2003, 2004 and 2005 were rendered false and misleading because, in violation of Generally Accepted Accounting Principles ("GAAP"), defendants understated expenses for the reporting period, since if the exercise price at the time of the actual grant is below the market price on that date, the difference, according to GAAP, must be expensed by the Company, which **it was not**, resulting in understating expenses and thus overstating net income.

6. In fact, defendants were aware that the practices employed by the Board of Directors allowed the stock option grants to be backdated frequently when the Company's shares were trading at or near the lowest price for the relevant period. By 2004 defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

7. On May 30, 2006, Rambus announced that the Audit Committee had commenced an internal investigation into the timing of the Company's stock option practices issued in or before 2003. The Company has also announced that the Audit Committee had uncovered discrepancies between the dates that some stock options went on the books and the dates that they should have been recorded under applicable accounting rules. As reported in BizJournal.Com on May 31, 2006, this announcement caused a 6.11% drop in Rambus' common stock price to $24.26.

8. On June 27, 2006 it was announced late in the afternoon that Rambus may have to restate earnings for prior periods due the back dating of option grants. Rambus shares fell 5% in

3

1    after hours trading.  The June 28, 2006 edition of <u>The Wall Street Journal</u> reported that a

2    preliminary board review found improperly dated stock-option grants that may lead to a restatement

3    of prior financial results: "Rambus's board 'has reached a preliminary conclusion that the actual

4    measurement dates for certain stock option grants issued in prior years differ from the recorded

5    grant dates for such awards,' the company said."  On June 27, 2006 Rambus common stock traded

6    at $23.13 per share, but on news of the above announcements Rambus common shares declined to

7    close at $20.55 per share on June 28, 2006.  Plaintiff and the members of the Class have been

8    damaged as a result of the above declines in Rambus' share price.

9                                    **JURISDICTION AND VENUE**

10        9.        Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the

11   "Exchange Act")[15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331, 1337. The claims asserted herein arise

12   under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§ 78n(a),

13   78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange

14   Commission ("SEC"), 17 C.F.R. § 240.10b-5.

15        10.       Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

16   U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c). Venue is proper in this District because many of the

17   acts and practices complained of herein occurred in substantial part in this District.

18        11.       In connection with the acts, transactions and conduct alleged herein, defendants used

19   the means and instrumentalities of interstate commerce, including the United States mails, interstate

20   telephone communications and the facilities of the national securities exchanges and markets.

21                                            **PARTIES**

22        12.       Plaintiff purchased shares of Rambus and engaged in transactions of Rambus

23   securities during the Class Period, as set forth in the certification attached hereto, and suffered

24   damages thereby.

25        13.       Defendant Rambus is a Delaware corporation with its principal executive offices

26   located at 4440 El Camino Real, Los Altos, California 94022.  According to its public filings,

27   Rambus is a technology licensing company specializing in the invention and designing of high-

28   speed chip interfaces.  Since its founding in 1990, the Company's patented innovations, break

                                                  4

through technologies and renowned integration expertise have helped industry-leading chip and system companies bring superior products to market.  Rambus is a supplier of process control and yield management solutions for the semiconductor manufacturing and related microelectronics industries.  Rambus' stock is publicly traded on the Nasdaq under the ticker symbol RMBS.

14.    Defendant Harold Hughes ("Hughes") has served as Chief Executive Officer of the Company since 2005 and has been a director of the Company since June 2003.  He also served as interim Chief Financial Officer of the Company for the period March 2, 2006 to on or about April 11, 2006.  Hughes also signed the Company's annual 10-K Reports for the years 2004 and 2005, authorized the issuance of the Company's Proxy Statements for that period, as well as certifications pursuant to the Sarbanes-Oxley Act of 2002.  Since at least as early as June 2003, he served as a member of the Audit Committee and served as its Chairman until January 9, 2005, at which time Hughes discontinued his service on the Audit Committee when he was elected by the Board to serve as Chief Executive Officer of the Company.  Hughes signed the 2004 and 2005 annual 10-K Reports for Rambus during this period as well as authorized the issuance of the Company's Proxy Statements for 2004 and 2005.

15.    Defendant Robert K. Eulau ("Eulau") served as the Senior Vice President of Finance and Chief Financial Officer of Rambus for the period from May 2001 until his resignation effective on or about March 2, 2006.  Eulau signed the various annual 10-K Reports for Rambus during the Class Period, as well as certifications pursuant to the Sarbanes-Oxley Act of 2002.  Defendant Eulau received backdated stock-option grants as set forth in Exhibit A attached hereto.

16.    Defendant Geoffrey Tate ("Tate") is Chairman of the Board of Directors.  Tate served as the Company's Chief Executive Officer until January 2005 and currently serves as Chairman of the Board of Directors of Rambus.  Tate served as President, Chief Executive Officer and director of the Company from May 1990 to December 1999.  Tate was also the sole member of the Stock Option Committee from October of 2001 until October 2003, when the Board of Directors dissolved the Stock Option Committee and vested its power and authority in Rambus' Compensation Committee of its Board of Directors (the "Compensation Committee").  Tate, as the sole member of the Stock Option Committee, had the authority to administer the issuance of stock

5

1   options under the Company's 1997 Stock Plan and the 1999 Non-Statutory Stock Option Plan of up

2   to 100,000 shares per employee per year, other than to executive officers and members of our Board

3   of Directors.  In addition, Tate had the authority to administer the issuance of common stock

4   equivalents under the 1997 Stock Plan.  Tate received backdated stock-option grants as set forth in

5   Exhibit A attached hereto.  Tate also signed all of the various annual 10-K Reports and authorized

6   the issuance of all of the Company's Proxy Statements during the entire Class Period.

7          17.    Defendant Bruce Dunlevie ("Dunlevie") is currently a director of the Company.

8   Dunlevie has served as a Director of the Company since its inception in March 1990.  Since at least

9   as early as October 2001, Dunlevie served, and currently serves, as a member of the Compensation

10   Committee of the Company, of which he is Chairman.  From at least as early as October 2001, until

11   he resigned on March 11, 2005, Dunlevie served as a member of the Audit Committee.  He has been

12   a General Partner of the venture capital firm Benchmark Capital since May 1995 and a General

13   Partner in the venture capital firm Merrill, Pickard, Anderson & Eyre since 1989.  Dunlevie also

14   signed the annual 10-K Reports during the Class Period and authorized the issuance of all of the

15   Company's Proxy Statements during the entire Class Period.

16          18.    Defendant P. Michael Farmwald ("Farmwald") has served as a Director of the

17   Company since co-founding the Company in March 1990 to present.  On January 25, 2005,

18   Farmwald was appointed to the Audit Committee, and currently serves there.  He was appointed to

19   the Compensation Committee during October 2002, and served there until July of 2003.  In addition,

20   he had served as Vice President and Chief Scientist of Rambus from March 1990 to November

21   1993.  Farmwald also signed the annual 10-K Reports during the Class Period and authorized the

22   issuance of the Company's Proxy Statements during the entire Class Period.

23          19.    Defendant John D. Danforth ("Danforth") served as Senior Vice-President, General

24   Counsel and Secretary of the Company since October 2001.  Danforth, in his capacity as Secretary,

25   signed the Company's Proxy Statements during the Class Period on behalf of the Board of

26   Directors.

27          20.    Defendant David Mooring ("Mooring") was a director of the Company since

28   December 1999 until May of 2006.  He signed all the Company's annual 10-K Reports during the

6

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

Class Period and authorized the issuance of the Company's Proxy Statements during the Class Period.  From 1999 to 2004, Mooring was President of Rambus. Mooring received backdated stock-option grants as set forth in Exhibit A attached hereto.

21.    Defendant Mark Horowitz ("Horowitz") has served as a Director of the Company since co-founding Rambus in March 1990.  He has also served as a Vice President from March 1990 to May 1994.  Horowitz signed all of the Company's annual 10-K Reports during the Class Period as well as authorized the issuance of the Company's Proxy Statements during the Class Period.

22.    Defendant Kevin Kennedy ("Kennedy") has served as a Director of  the Company since April 2003.  He also has served, since July 2003 and continues to serve, as a member of the Compensation Committee and also serves as a member of the Corporate Governance and Nominating Committee, of which he is the Chairman.  Kennedy signed Rambus' 2003, 2004 and 2005 annual 10-K Reports and authorized the issuance of the Company's Proxy Statements for 2004 and 2005.

23.    Defendant William Davidow ("Davidow") served as a director of  the Company since the founding of the Company in March 1990 until May 4, 2005 at which time he was appointed Director Emeritus.  He served as Chairman of the Board of Directors from March 1990 until January 2005.  He served as a member of both the Audit Committee and Compensation Committee since as early as December 2001.  Davidow signed Rambus' 2001, 2002, 2003 and 2004 annual 10-K Reports and authorized the issuance of the Company's Proxy Statements for 2001, 2002, 2003, 2004 and 2005.

24.    Defendant Charles Geschke ("Geschke") served as a director of Rambus since February 1996 until he resigned effective March 11, 2005.  He was a member of the Audit Committee from as early as December 2001 until July 2003.  He was a member of the Compensation Committee from as early as December 2001 and its Chairman from October 2002. He was a member of the Corporate Governance/Nominating Committee from the time it was formed in October 2002.  Geschke signed Rambus' 2001, 2002, 2003 and 2004 annual 10-K Reports and authorized the issuance of the Company's Proxy Statements for 2001, 2002, 2003 and 2004.

7

25.     Collectively, defendants Hughes, Eulau, Mooring, Tate, Dunlevie, Farmwald, Danforth, Horowitz, Kennedy, Chou, Davidow and Geschke are referred thereon as the "Individual Defendants."

26.     Defendants Davidow, Geschke, Dunlevie, Hughes, and Farmwald are also referred to as the "Audit Committee Directors."  Defendants Farmwald, Geschke, Dunlevie, and Kennedy are also referred to as the "Compensation Committee Directors."  Defendants Tate, Mooring, Danforth and Eulau are also referred to herein as the "Backdated Option Recipients."

## CLASS ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal  Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Rambus between December 12, 2001, (the date the Company filed its form 10-K with the SEC for the its fiscal year ending September 30, 2001)) and June 27, 2006 (the date the Company disclosed that it planned to restate earnings for certain period  because of its practice of backdating options), inclusive and who were damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, Rambus had more than 100 million shares of common stock outstanding, which were actively traded on the NASDAQ, under the ticker symbol "RMBS," and tens of millions of shares of common stock were traded during the Class Period.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery.  Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rambus or its transfer agent and brokerage firms and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

8

1      29.     Plaintiff's claims are typical of the claims of the members of the Class as all

2 members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

3 law that is complained of herein.

4      30.     Plaintiff will fairly and adequately protect the interests of the members of the Class

5 and has retained counsel competent and experienced in class and securities litigation.

6      31.     Common questions of law and fact exist as to all members of the Class and

7 predominate over any questions solely affecting individual members of the Class.  Among the

8 questions of law and fact common to the Class are:

9          (a)     whether the federal securities laws were violated by defendants' acts as

10 alleged herein;

11         (b)     whether statements made by defendants to the investing public during the

12 Class Period misrepresented material facts about a.) how the Company awarded options to its

13 executives, and b.) whether the Company's financial form 10-K and Proxy Statements, filed with

14 the SEC during the Class Period ,contained false and misleading statements; and

15         (c)     to what extent the members of the Class have sustained damages and the

16 proper measure of damages.

17      32.     A class action is superior to all other available methods for the fair and efficient

18 adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

19 damages suffered by individual Class members may be relatively small, the expense and burden of

20 individual litigation make it impossible for members of the Class to individually redress the wrongs

21 done to them.  There will be no difficulty in the management of this action as a class action.

22 **SUBSTANTIVE ALLEGATIONS**

23      33.     From fiscal 2001 to 2004[1], the Compensation Committee granted certain Rambus

24 stock options to the Backdated Option Recipients and certain other executives of the Company, as

25 set forth in Exhibit A hereto.  Frequently the grants were dated just after a sharp drop in the

26

27         [1] Rambus' fiscal years 2001 and 2002 ended on September 30 of 2001 and 2002,

28 respectively.  Fiscal years 2003-2006 ended on December 31.

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

Company's stock price and before a substantial rise in the Company's stock price.  See Exhibit B attached hereto which shows the exercise price for Rambus shares on the various  dates of grant compared to the price of Rambus stock for ten days before and after such grant.

34.     For example, as demonstrated on Exhibit A, the Company's  Proxy statement filed with the SEC March 19, 2004 reported that on November 25, 2003, defendants Tate, Mooring and Eulau, in addition to Rambus officers, John D. Danforth, the Company's Sr. Vice-President, General Counsel and Secretary and Ed Larsen, the Company's Sr. Vice-President for Administration, received options for 760,000 common shares of Rambus at an exercise price of $25.16, or the price of shares on the date of grant.  However, a mere three days later, on November 28, the price had risen to close at $30.00 per share, thus creating an almost instant profit for the recipients of these options of nearly $3,800,000.

35.     Similarly, on August 23, 2001 options were issued at $4.86 and the next day the price went to $5.67 per share and three days after that, on August 27, to $7.37 per share.  More extraordinary, the price of Rambus shares had been $5.35 per share on the day before the option grant date.  In fact, the exercise price of $4.86 per share was virtually the lowest trading price of Rambus shares on the 10 days before the option grant date of August 23, 2001 **and** the 10 days after that date. (See Exhibit B).  Defendants Tate and Mooring each received options to purchase 600,000 shares of Rambus and realized virtually instant profits of over $1.5 million dollars each.

36.     The reason for the extraordinary pattern of stock option grants as alleged herein is that many, if not all, of the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, at the behest of the defendants, and/or the Compensation Committee, defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Rambus stock was lower than the market price on the actual grant dates.

37.     This improper backdating violated the terms of the Company's shareholder-approved stock option plan.  Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the closing price of Rambus stock on the date of grant.  In this way, the executives of a company are supposed to have their interests

COMPLAINT
CASE NO.
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1   aligned with the shareholders, whose holdings are diluted each time an option is exercised.

2   Backdating improperly increased the value of the options to the Backdated Option Recipients and

3   gave them an immediate paper profit which undermined the incentive purpose of such options,

4   improperly reduced the amounts the Backdated Option Recipients had to pay the Company upon

5   exercise of the options, and unfairly transferred shareholder equity to defendants.

6          38.     On or about June 6, 1997 Rambus filed with the SEC a Registration Statement on

7   Form S-8 registering its 1990 Stock Plan, 1997 Stock Plan and 1997 Employee Stock Purchase

8   Plan.  The 1997 Stock Plan, contained as a exhibit therein, stated that options granted under the Plan

9   may be Incentive Stock Options or Nonstatutory Stock Options.  The Plan at Section 9 defines the

10  "Exercise Price" as follows:

11          9       Option Exercise Price and Consideration.

12          (a)     Exercise Price.  The per share exercise price for the Shares to be
                    issued pursuant to exercise of an Option shall be determined by the
13                  Administrator, subject to the following:

14                  (i)     In the case of an Incentive Stock Option

15                          (A)     granted to an Employee who, at the time the Incentive
                    Stock Option is granted, owns stock representing more than ten
16                  percent (10%) of the voting power of all classes of stock of the
                    Company or any Parent or Subsidiary, the per Share exercise price
17                  shall be no less than 110% of the Fair Market Value per Share on the
                    date of grant.
18
                            (B)     granted to any Employee other than an Employee
19                  described in paragraph (A) immediately above, <u>the per Share exercise
                    price shall be no less than 100% of the Fair Market Value per Share
20                  on the date of grant</u>. (emphasis added)

21                  (ii)    In the case of a Nonstatutory Stock Option, the per Share
                            exercise price shall be determined by the Administrator.  In the
22                  case of a Nonstatutory Stock Option intended to qualify as
                    "performance-based compensation" within the meaning of
23                  Section 162(m) of the Code, <u>the per Share exercise price shall
                    be no less than 100% of the Fair Market Value per Share on
24                  the date of grant</u>. (emphasis added)

25          39.     Defendants' conduct also violated the terms of the Company's own corporate

26  governance guidelines, the Company's standards of business conduct and the Company's conflicts

27  of interest policy.  For example, the Company's Code of Business Conduct and Ethics provides that

28  each director, officer and employee may not profit from possession of significant, non-public

                                              11

1   information; and must engage in "honest and ethical conduct, including the ethical handling of

2   actual or apparent conflicts of interest between personal and professional relationships."  The Code

3   further states that Rambus has a responsibility to communicate effectively with shareholders so that

4   they are provided with full and accurate information in all material respects, about Rambus'

5   financial condition and results of operations.

6       **A.    Defendants Concealed Their Backdating of Stock Options Thus Rendering
               Rambus' Proxy Statements Materially False and Misleading**

7

8       40.    Defendants' backdating scheme also rendered the Company's Proxy Statements

9   issued in connection with shareholder meetings held from 2002 to 2005 materially false and

10  misleading.  The Proxy Statements falsely reported the dates of the stock option grants and falsely

11  represented that the options were granted at fair market value.  If the option grant was backdated,

12  the options value was not fair from the vantage point of the Company and its shareholders.  For

13  example, a report on the 2003 Executive Compensation contained in Rambus' 2004 Proxy

14  Statement falsely represented that "non-cash compensation [to executives] should be closely aligned

15  with shareholder interests."  In addition, Rambus Proxy's statement filed in 2005 was also false and

16  misleading because in it defendants continued to conceal the Company's illicit policy of backdating

17  options.

18      41.    Rambus issued its Proxy Statement dated December 20, 2001 for the annual meeting

19  of stockholders to be held February 5, 2002.  This proxy statement disclosed certain information

20  regarding stock options granted to each of the named executive officers for the fiscal year ended

21  September 30, 2001, and stated further, in a footnote, "Unless otherwise indicated, options were

22  granted at an exercise price equal to the fair market value of the Company's Common Stock at the

23  date of the grant."  This proxy statement, signed by defendant Danforth, on behalf of the Board of

24  Directors, including defendants Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and

25  Davidow, was false and misleading as no mention was made that some or all of the options granted

26  to members of management during the current and prior fiscal years may have been backdated or

27  otherwise manipulated.

28

12

1        42.     Rambus issued its Proxy Statement dated December 19, 2002 for the annual meeting

2 of stockholders to be held January 30, 2003.  This proxy statement disclosed certain information

3 regarding stock options granted to each of the named executive officers for the fiscal year ended

4 September 30, 2002, and stated further, in a footnote, "Unless otherwise indicated, options were

5 granted at an exercise price equal to the fair market value of the Company's Common Stock at the

6 date of the grant."  This proxy statement, signed by defendant Danforth on behalf of the Board of

7 Directors, including defendants Tate, Mooring, Eulau, Dunlevie, Farmwald, Horowitz, Geschke and

8 Davidow, was false and misleading as no mention was made that some or all of the options granted

9 to members of management during the current and prior fiscal years may have been backdated or

10 otherwise manipulated.

11        43.     Rambus issued its Proxy Statement dated March 19, 2004 for the annual meeting of

12 stockholders to be held May 4, 2004.  This proxy statement disclosed certain information regarding

13 stock options granted to each of the named executive officers during 2003, and the transitional

14 period October 1, 2002 to December 1, 2002 (due to change of reporting period), including the

15 exercise price and stated further, in a footnote, "Unless otherwise indicated, options were granted at

16 an exercise price equal to the fair market value of the Company's Common Stock at the date of the

17 grant."  This proxy statement, signed by defendant Danforth on behalf of the Board of Directors,

18 which included defendants Hughes, Kennedy, Tate, Mooring, Eulau, Dunlevie, Farmwald,

19 Horowitz, Geschke and Davidow, was false and misleading as no mention was made that some or

20 all of the options granted to members of management during the current and prior periods may have

21 been backdated or otherwise manipulated.

22        44.     Rambus issued its Proxy Statement dated March 29, 2005 for the annual meeting of

23 stockholders to be held May 3, 2005.  This proxy statement disclosed certain information regarding

24 stock options granted including the exercise price to each of the named executive officers during

25 2004 including the purported exercise price, and stated further, in a footnote, "Unless otherwise

26 indicated, options were granted at an exercise price equal to the fair market value of the Company's

27 Common Stock at the date of the grant."  This proxy statement, signed by defendant Danforth on

28 behalf of the Board of Directors, which included defendants Hughes, Kennedy, Tate, Mooring,

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1   Eulau, Dunlevie, Farmwald, Horowitz, Geschke and Davidow, was false and misleading as no

2   mention was made that some or all of the options granted to members of management during the

3   current and prior years may have been backdated or otherwise manipulated.

4   **B.    Defendants' Backdating of Options Also Rendered Their Annual Report
          on Form 10-k to Be Materially False and Misleading**

5

6          45.    Defendants' backdating scheme also rendered the Company's financial statements in

7   Form 10-K filings for fiscal years 2001, 2002, 2003 and 2004 to be materially false and misleading.

8          46.    Pursuant to APB 25, the applicable GAAP provision at the time of the foregoing

9   stock option grants, if the market price on the date of grant exceeds the exercise price of the options,

10  the company must recognize the difference as an expense, thereby reducing the company's net

11  income.

12         47.    In addition, as set forth in the Company's Proxy Statements, the Company has

13  adopted IRS§162(m) (Section 162(m) of the Tax Code, 26 U.S.C. §162) which permits the

14  Company to deduct for federal income taxes purposes compensation paid under the Bonus Plan.

15  The Company's Proxy Statements claimed that the 1997 Stock Plan was designed and administered

16  to meet the requirements of Section 162(m).  Pursuant to Section 162(m), compensation in excess of

17  $1 million per year, including gains on stock options, paid to a corporation's five most

18  highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on

19  account of the attainment of one or more performance goals; (ii) the performance goals are

20  determined by a compensation committee comprised solely of two or more outside directors, (iii)

21  the material terms under which the compensation is to be paid, including the performance goals, are

22  disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote

23  before payment of the compensation, and (iv) before any payment of such compensation, the

24  compensation committee certifies that the performance goals and any other material terms were in

25  fact satisfied.

26         48.    As a result of the improper backdating of stock options, the Company, with the

27  knowledge, approval, and participation of each of the defendants, violated GAAP by failing to

28  recognize compensation expenses incurred when the improperly backdated options were granted;

14

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1   violated §162(m) by taking tax deductions based on stock option grants that were not payable solely

2   on account of the attainment of one or more performance goals and violated the terms of the

3   Company's shareholder-approved stock option plans.

4          49.     On or about December 4, 2001 the Company filed its Form 10-K report for the fiscal

5   year ended September 30, 2001 with the SEC.  The 10-K report was contemporaneously distributed

6   to the public including its shareholders.  This Form 10-K report contained the Company's

7   comparative financial statements for the current and prior fiscal years which were materially false

8   and misleading and were not prepared in accordance with generally accepted accounting principles

9   due to the improper accounting for stock option grants which were backdated.  As a result Rambus'

10  net earnings and stockholders' equity were overstated and the compensation costs attributable to the

11  backdated stock options were correspondingly understated.  Rambus will now be forced to

12  acknowledge serious shortcomings in its administration and accounting for stock options.

13         50.     Also, the Company stated in a footnote to the financial statements that, "Rambus

14  accounts for stock-based awards to employees using the intrinsic value method in accordance with

15  Accounting Principle Board Opinion No. 25, "Accounting for Stock Issued to Employees."  Stock

16  options are generally granted with exercise prices equivalent to fair market value, and no

17  compensation cost is recognized.  When stock options are compensation granted with exercise

18  prices below fair market value, employee stock-related compensation expense is recognized

19  accordingly."

20         51.     On or about November 26, 2002 the Company filed its Form 10-K report for the

21  fiscal year ended September 30, 2002 with the SEC.  This 10-K was signed by defendants Tate,

22  Mooring, Eulau, Davidow, Dunlevie, Farmwald, Geschke and Horowitz.  The 10-K report was

23  contemporaneously distributed to the public including its shareholders.  This Form 10-K report

24  contained the Company's comparative financial statements for the current and prior fiscal years

25  which were materially false and misleading and were not prepared in accordance with GAAP due to

26  the improper accounting for stock option grants which were backdated.  As a result Rambus' net

27  earnings and stockholders' equity were overstated and the compensation costs attributable to the

28  backdated stock options were correspondingly understated, according to the accounting principles

15

COMPLAINT
CASE NO.
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1   set forth in paragraphs 46-48 above.  Rambus will now be forced to acknowledge serious

2   shortcomings in its administration and accounting for stock options.

3       52.     Also, the Company stated in a footnote to the financial statements that, "Rambus

4   accounts for stock-based awards to employees using the intrinsic value method in accordance with

5   Accounting Principle Board Opinion No. 25, "Accounting for Stock Issued to Employees."  Stock

6   options are generally granted with exercise prices equivalent to fair market value, and no

7   compensation cost is recognized.  When stock options are compensation granted with exercise

8   prices below fair market value, employee stock-related compensation expense is recognized

9   accordingly."

10      53.     In connection with the November 2002 10-K, the Company submitted to the SEC the

11  certifications of its principal executive officer, defendant Tate, and its principal financial officer,

12  defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the

13  Sarbanes-Oxley Act of 2002.  Each such certification of defendants Tate and Eulau stated, "Based

14  on my knowledge, this report does not contain any untrue statement of material fact or omit to state

15  a material fact necessary to make the statements made, in light of the circumstances under which

16  such statements were made, not misleading with respect to the period covered by this report."

17      54.     On or about February 13, 2004 the Company filed its Form 10-K report for the year

18  ended December 31, 2003.  This 10-K was signed by defendants Tate, Mooring, Eulau, Davidow,

19  Dunlevie, Farmwald, Geschke, Horowitz, Hughes and Kennedy.  The 10-K report was

20  contemporaneously distributed to the public including its shareholders.  This Form 10-K report

21  contained the Company's comparative financial statements for the years 2003 and 2002 and three

22  months ended December 31, 2002 and 2001 which were materially false and misleading and were

23  not prepared in accordance with GAAP due to the improper accounting for stock option grants

24  which were backdated.  As a result, Rambus' net earnings and stockholders' equity were overstated

25  and the compensation costs attributable to the backdated options were correspondingly understated,

26  according to the accounting principles set forth in paragraphs 46-48 above.  Rambus will now be

27  forced to acknowledge serious shortcomings in its administration and accounting for stock options.

28

55.     Also, the Company stated in a footnote to the financial statements that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, "Accounting for Stock Issued to Employees." Stock options are generally granted with exercise prices equivalent to fair market value, and no compensation cost is recognized.  When stock options are compensation granted with exercise prices below fair market value, employee stock-related compensation expense is recognized accordingly."

56.     In connection with the February 2004 10-K, the Company submitted to the SEC the certifications of its principal executive officer, defendant Tate, and its principal financial officer, defendant Eulau, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.  Each such certification of defendants Tate and Eulau stated, "Based on my knowledge, this report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

57.     On or about February 17, 2005 the Company filed its Form 10-K report for the year ended December 31, 2004 with the SEC.  The 10-K report was contemporaneously distributed to the public including its shareholders.  This Form 10-K report contained the Company's comparative financial statements for the current and prior year which were materially false and misleading and were not prepared in accordance with generally accepted accounting principles due to the improper accounting for stock option grants which were backdated.  As a result, Rambus' net earnings were overstated and the compensation costs attributable to the backdated options were correspondingly understated, according to the accounting principles set forth in paragraphs 46-48 above.  Rambus will now be forced to acknowledge serious shortcomings in its administration and accounting for stock options.

58.     Also, the Company stated in a footnote to the financial statements that, "Rambus accounts for stock-based awards to employees using the intrinsic value method in accordance with Accounting Principle Board Opinion No. 25, "Accounting for Stock Issued to Employees." Stock options are generally granted with exercise prices equivalent to fair market value, and no

17

1    compensation cost is recognized.  When stock options are compensation granted with exercise

2    prices below fair market value, employee stock-related compensation expense is recognized

3    accordingly."

4          59.    In connection with the February 2005 10-K, the Company submitted to the SEC the

5    certifications of its principal executive officer, defendant Hughes, and its principal financial officer,

6    defendant Eulau, respectively, as required pursuant to 18 U.S.C. 1350, as adopted pursuant to

7    Section 906 of the Sarbanes-Oxley Act of 2002.  Each such certification of defendants Hughes and

8    Eulau stated, "Based on my knowledge, this report does not contain any untrue statement of material

9    fact or omit to state a material fact necessary to make the statements made, in light of the

10   circumstances under which such statements were made, not misleading with respect to the period

11   covered by this report."

12         60.    On or about February 21, 2006 the Company filed its Form 10-K report for the year

13   ended December 31, 2005 with the SEC.  This 10-K was signed by defendants Hughes, Eulau, Tate,

14   Dunlevie, Farmwald, Horowitz, and Mooring.   The 10-K report was contemporaneously distributed

15   to the public including its shareholders.  This Form 10-K report contained the Company's

16   comparative financial statements for the prior years which were materially false and misleading and

17   were not prepared in accordance with generally accepted accounting principles due to the improper

18   accounting for stock option grants which were backdated.  As a result Rambus' net earnings and

19   stockholders' equity for prior years was overstated and the compensation costs attributable to the

20   backdated stock options were correspondingly understated, according to the accounting principles

21   set forth in paragraphs 46-48 above, Rambus will now be forced to acknowledge serious

22   shortcomings in its administration and accounting for stock options.  In connection with this report

23   the Company submitted to the SEC the certifications of its principal executive officer and its

24   principal financial officer a required pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906

25   of the Sarbanes-Oxley Act of 2002.  Each such certification of defendants Hughes, Eulau, Tate,

26   Dunlevie, Farmwald, Horowitz, and Mooring stated, "Based on my knowledge, this report does not

27   contain any untrue statement of material fact or omit to state a material fact necessary to make the

28

18

1  statements made, in light of the circumstances under which such statements were made, not

2  misleading with respect to the period covered by this report."

3      61.    As a result of all of the foregoing, plaintiff and members of the Class have been

4  damaged.  On May 31, 2006, after news of the Audit Committee's investigation of backdating of

5  stock options, Rambus common shares declined from a close of $25.84 on May 30 to a close of

6  $24.26 on May 31.  On June 28, 2006, Rambus shares declined over 6% or from $23.13.

7                    **APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE**

8      62.    At all relevant times, the market for Rambus' common stock was an efficient market

9  for the following reasons, among others:

10         (a)    Rambus' common stock met the requirements for listing, and was listed and

11  actively traded on the NASDAQ, a highly efficient and automated market;

12         (b)    As a regulated issuer, Rambus filed periodic public reports with the SEC and

13  the NASDAQ;

14         (c)    Rambus regularly communicated with public investors <u>via</u> established market

15  communication mechanisms, including through regular disseminations of press releases on the

16  national circuits of major newswire services and through other wide-ranging public disclosures,

17  such as communications with the financial press and other similar reporting services; and

18         (d)    Rambus was followed by securities analysts, including those who were

19  employed by major brokerage firms, who wrote reports which were distributed to the sales force and

20  certain customers of their respective brokerage firms.  Each of these reports was publicly available

21  and entered the public marketplace.

22      63.    As a result of the foregoing, the market for Rambus' promptly digested current

23  information regarding Rambus from all publicly available sources and reflected such information in

24  Rambus' stock price.  Under these circumstances, all purchasers of Rambus common stock during

25  the Class Period suffered similar injury through their purchase of Rambus' common stock at

26  artificially inflated prices and a presumption of reliance applies

27

28

                                    19

## ADDITIONAL SCIENTER ALLEGATIONS

64.    On May 30, 2006 Rambus issued a press release which  "… announced that the Audit Committee of the Company's Board of Directors has commenced an internal investigation of the timing of past option grants and other potentially related issues...."

65.    Certain member of Rambus' management listed below, including defendants Mooring, Eulau and Danforth as Backdated Option Recipients, in the months preceding the May 30, 2006 announcement (from January 1, 2006), sold a total of 2,295,099 artificially inflated Rambus shares, while in the possession of materially adverse inside knowledge regarding backdating options scheme, as described herein.  Many of these shares were acquired by the exercise of stock options for proceeds of $74,261,265 as follows:

TOTAL SHARES AND PROCEEDS:

|  | SHARES | PROCEEDS | AVERAGE PER SHARE PROCEEDS |
|---|---|---|---|
| Mooring | 1,591,999 | $ 51,318,569 | $ 32.22 |
| Eulau | 350,000 | $ 10,510,715 | $ 30.03 |
| Danforth | 170,000 | $  6,096,608 | $ 35.86 |
| Stark[2] | 183,100 | $  6,335,373 | $ 34.60 |
| TOTALS | 2,295,099 | $ 74,261,265 | $ 32.36 |

66.    Members of the Compensation Committee during all or part of the Class Period, which included Individual Defendants Farmwald, Geschke, Dunlevie, and Kennedy (previously defined herein as the "Compensation Committee Directors"), were aware of, or but for their reckless disregard should have been aware of, the backdating options scheme.  The Charter of the Compensation Committee of Rambus states that the purpose of the Compensation Committee is, inter alia, to "recommend and approve appropriate executive compensation" and to "make

_____

[2]  Laura S. Stark is the Sr. Vice President, Platform Solutions.  Mrs. Stark joined Rambus in 1996 as Strategic Accounts Manager, and held the positions of Strategic Accounts Director and Vice President, Alliances and Infrastructure, before assuming the position of Vice President, Memory Interface Division in October 2000, which she held until February 2005 when she was appointed Vice President, Platform Solutions.

COMPLAINT
CASE NO.
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1  recommendations to the Board regarding director compensation." The Committee is charged with

2  annually reviewing and approving for the CEO and executive officers of the Company, the annual

3  salary, bonuses, equity compensation, incentive bonuses and any other benefits, compensation or

4  arrangements. Therefore, because of their intricate involvement in the formulation and issuance of

5  such options, the Compensation Committee Directors possessed the requisite <u>scienter</u>.

6       67.    Those defendants who were members of the Audit Committee, which included

7  Individual Defendants Davidow, Geschke, Dunlevie and Hughes (previously defined herein as the

8  "Compensation Committee Directors") for some of all of the Class Period, were responsible for

9  maintaining the adequacy of  internal controls, and therefore, knew, or at a minimum recklessly

10  disregarded, the impermissible option backdating scheme which internal controls of the Company

11  should have detected. The Audit Committee Charter of Rambus states that the Company has an

12  obligation to insure that it produces and publicly distributes financial statements which are

13  consistent, fairly presented and in conformance with generally accepted accounting principles. It is

14  the duty of the Audit Committee to oversee the Company's accounting and financial reporting

15  process, its system of internal accounting controls and the auditing of the Company's financial

16  statements. In addition, members of the Audit Committee whose duty it was to meet periodically

17  with management to review the adequacy of the Company's internal controls, did, or but for their

18  reckless disregard should have, detected and been aware of the illicit option backdating scheme.

19  Therefore, the Audit Committee Directors possessed the requisite <u>scienter</u>.

20  **COUNT I**

21  **FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND RULE10b-5 PROMULGATED THEREUNDER**

22  

23       68.    Plaintiff repeats and realleges each and every allegation set forth above. During the

24  Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct that

25  was intended to and/or did: (i) deceive the investing public, including Plaintiff and other Class

26  members, as alleged herein; (ii) artificially inflate  the market price of Rambus common stock; and

27  (iii) cause plaintiff and other members of the Class to buy Rambus stock at artificially inflated

28  

21

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1   prices.  In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of

2   them, took the actions set forth herein.

3          69.     These defendants:  (a) employed devices, schemes and artifices to defraud; (b) made

4   untrue statements of material fact and/or omitted to state material facts necessary to make the

5   statements not misleading; and (c) engaged in acts, practices and a course of business which

6   operated as a fraud and deceit upon the buyers of Rambus common stock in violation of Section

7   10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

8          70.     Defendants' material misrepresentations and/or omissions were done knowingly or

9   recklessly.

10         71.     As a result of the defendants' dissemination of deceptive and misleading information

11  regarding the Rambus' practice of  backdating options in violation of the Company's own internal

12  policies and procedures and in contradiction to statement made in the Company's filings with the

13  SEC.  Furthermore, the backdating of options resulted in understating expenses and thus overstating

14  net income in the Company's financial results contained in Rambus' Form 10-Ks filed with the SEC

15  during the Class Period.  In ignorance of the fact that the market price of Rambus' shares were

16  artificially inflated, and relying upon the integrity of the market in which Rambus common stock

17  trades, and/or on the absence of material information that was known to and/or recklessly

18  disregarded by defendants but not disclosed in public statements by defendants during the Class

19  Period, plaintiff and the other members of the Class bought Rambus common stock during the Class

20  Period at artificially inflated prices and were damaged thereby.

21         72.     At the time of said misrepresentations and omissions, plaintiff and the other

22  members of the Class were ignorant of the omitted material facts and believed defendants'

23  statements regarding the awarding of options and their financial statements contained in their Form

24  10-Ks to be completely truthful, candid and not deceptive or misleading or suffering from omissions

25  of material facts.  Had plaintiff and the other members of the Class known of the omitted material

26  facts, plaintiff and the other members of the Class would not have bought their Rambus common

27  stock during the Class Period, or, if they had bought such stock during the Class Period, they would

28

22

1   not have done so at the artificially inflated prices which they paid for their Rambus common stock

2   which they bought during the Class Period.

3        73.    By virtue of the foregoing, each of the defendants violated Section 10(b) of the

4   Exchange Act and Rule 10b-5 promulgated thereunder.

5        74.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the

6   other members of the Class suffered damages in connection with their purchases of Rambus

7   common stock during the Class Period.

8                        **COUNT II**

9   **FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**

10        75.    Plaintiff incorporates by reference and realleges each and every allegation set forth

11   above, as though fully set forth herein.

12        76.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act provides that

13   no proxy statement shall contain "any statement which at the time and in light of the circumstances

14   under which it is made is false and misleading with respect to any material fact, or which omits to

15   state any material fact necessary in order to make the statements therein not false and misleading."

16   17 C.F.R. Section 240.14a-9.

17        77.    The Proxy Statements for annual shareholder meetings held in 2002 through 2005

18   violated Rule 14(a) and Rule 14a-9 because they omitted material facts, including the fact that

19   defendants were causing Rambus to engage in an option backdating scheme, a fact which the

20   defendants were aware of and participated in from at least 2001.

21        78.    In the exercise of reasonable care, defendants should have known that the Proxy

22   Statements were materially false and misleading.

23        79.    The misrepresentations and omissions in the Proxy Statement were material to

24   plaintiff in voting on each Proxy Statement.  The Proxy Statements were an essential link in the

25   accomplishment and continuation of defendants' unlawful stock option backdating scheme, as

26   revelations of the truth would have immediately thwarted a continuation of shareholders'

27   endorsement of the directors' position, the executive officers' compensation and the Company's

28   compensation policies.

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

80.     Plaintiff, and the Class, were damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### AGAINST THE INDIVIDUAL DEFENDANTS PURSUANT TO SECTION 20(a) OF THE EXCHANGE ACT

81.     Plaintiff repeats and realleges each and every allegation set forth above.

82.     This claim is asserted against the Individual Defendants pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

83.     During the Class Period, Individual Defendants Hughes, Eulau, Mooring, Tate, Dunlevie, Farmwald, Horowitz, Kennedy, Danforth, Davidow and Geschke were "controlling persons" of defendant Rambus, within the meaning of Section 20(a) of the Exchange Act.

84.     The Individual Defendants were "controlling persons" of Rambus because, due to the officer and/or director positions they held with Rambus, they had the influence and power over Rambus to cause, and they did cause, Rambus to engage in the wrongful conduct complained of herein, and because they had the power to have prevented Rambus from engaging in the unlawful conduct alleged herein, but they purposely, intentionally and recklessly did not use that power to do so.

85.     As set forth above in Count I, Rambus violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.  By virtue of their status as a "controlling person" of Rambus, the Individual Defendants are liable, to the same extent as is Rambus for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, pursuant to Section 20(a) of the Exchange Act.

86.     As set forth in Count II, Rambus violated Section 14(a) of the Exchange Act by its acts and omissions.  By virtue of their status as a "controlling person" of Rambus, the Individual Defendants are liable, to the same extent as is Rambus for its violations of Section 14(a) of the Exchange Act, pursuant to Section 20(a) of the Exchange Act.

24

1

<u>**PRAYER FOR RELIEF**</u>

2          WHEREFORE, plaintiff, on behalf of itself and the Class, pray for judgment as follows:

3    A.    Declaring this action to be a class action properly maintained pursuant to Rule 23(a)

4          and (b)(3) of the Federal Rules of Civil Procedure;

5    B.    Finding that the defendants violated Section 10(b) of the Exchange Act and Rule

6          10b-5 promulgated thereunder and Sections 20(a) and  14(a) by their acts and

7          omissions as alleged in this Complaint;

8    C.    Awarding plaintiff and the members of the Class damages, together with interest

9          thereon;

10   D.    Awarding plaintiff and other members of the Class their costs and expenses of this

11         litigation, including reasonable attorneys' fees and experts' fees and other costs and

12         disbursements; and

13   E.    Awarding plaintiff and other members of the Class such other and further relief as

14         may be just and proper under the circumstances

15

<u>**JURY TRIAL DEMANDED**</u>

16         Plaintiff demands a trial by jury as to all issues so triable.

17   Dated: July 14, 2006                    Timothy J. Burke
                                             STULL, STULL & BRODY
18

19
                                    By:    _____/s/_____
20                                         Timothy J. Burke
                                           10940 Wilshire Boulevard
21                                         Suite 2300
                                           Los Angeles, CA  90024
22                                         Tel:    (310) 209-2468
                                           Fax:    (310) 209-2087
23
                                           Howard T. Longman
24                                         STULL, STULL & BRODY
                                           6 East 45th Street
25                                         New York, NY 10017
                                           Tel:    (212) 687-7230
26                                         Fax:    (212) 490-2022

27   //

28   //

25

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gary S. Graifman
KANTROWITZ, GOLDHAMER & GRAIFMAN
210 Summit Avenue
Montvale, NJ  07645
Tel:     (201) 391-7000
Fax:     (201) 307-1088

Attorneys for Plaintiff

**COMPLAINT**
**CASE NO.**
W:\STULL\RAMBUS\PLD\COMPLAINT 003 (Judge's Version).wpd